PHILLIP A. TALBERT
United States Attorney
MATTHEW G. MORRIS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:03-CR-379-JAM-CKD |
|---|---|
| Plaintiff, | MOTION TO DISMISS |
| v. | |
| YULY KROYTOR, | |
| Defendant. | |

Kroytor filed his most recent motion on October 13, 2021. ECF 78. The Court has ordered the government to answer or file a motion to dismiss. ECF 84. The government moves the Court to dismiss the petition on the grounds that Kroytor waived his right to bring a collateral attack on his conviction and on the equitable defense of laches.

## I.   BACKGROUND

### A.   Kroytor is a fraudster.

After living in the country for several years, the defendant became a lawful permanent resident in 1995. ECF 78-2 at 2. Beginning roughly five years after receiving permission to live among us permanently, he began a multi-year course of conduct in which he defrauded the taxpayers of between $80,000 and $500,000. He accomplished his crime by purchasing fraudulent prescriptions from medical clinics, which he then used to substantiate false bills that he submitted to Medi-Cal for reimbursement. ECF 78-7. He was not caught when his conscience eventually got the better of him. Rather, he only

Mot. to Dismiss                                   1

stopped his fraud when he was informed that he was under investigation (and even then only after he was caught giving false information to a state of California auditor who was investigating his conduct.)

In 2003, he negotiated a pre-indictment plea agreement.  ECF 78-8.  The government agreed not to bring additional charges, offered him a chance for a cooperation departure under U.S.S.G. § 5K1.1, and agreed to recommend a sentence as low as 12 months in a halfway house—a substantial downward variance from the advisory guideline range of 24 to 30 months in federal prison—provided that the defendant lived up to his end of the agreement.  *Id*.  The defendant agreed never to make "any collateral attack on any aspect of the proceedings."  *Id*.  At the time of the entry of his plea, Judge Damrell warned Kroytor that his conviction could result in deportation.  ECF 78-6 at 9–10. Nevertheless, Kroytor asserted that he wanted to plead guilty anyway.

Despite a recommendation from the probation officer that Kroytor serve 24 months in prison, he received a particularly lenient sentence, largely on the basis of the recommendation he obtained from the government as part of his bargain.  Following the § 5K1.1 recommendation of the government, the Court varied downward to sentence the defendant to only five months in a halfway house.  ECF 78-9 at 5:4–7.  However, just three months after Kroytor received a substantial cooperation adjustment, the government was forced to dismiss the indictment against the person who was implicated by the defendant during his so-called cooperation, because "the government now has reason to question the guilt of [that] defendant."  ECF 41-1.  Several years later, the Court amended the judgment to reflect restitution in the amount of $80,000.  ECF 26.  The defendant filed a motion to correct the judgment to remove that reference, and the government did not oppose that.  ECF 26–32.

    **B.**    <u>**After (long after) receiving a notice to appear for immigration proceedings in 2007, Kroytor attacks his convictions in 2016 and 2021.**</u>

In Kroytor's first *coram nobis* petition, he swore under penalty of perjury that his pre-plea attorney, Mr. Graysen, never had any discussion with him about the immigration consequences.  ECF 37-1 ¶ 7.  His wife swore the same.  ECF 37-2 ¶ 3.  Accordingly, Kroytor acknowledged in his first *coram nobis* petition that "Kroytor cannot attack Graysen's representation because Graysen gave him no immigration advice at all and counsel's duty to advise a noncitizen client about the immigration consequences of a guilty plea did not arise until" *Padilla*.  Accordingly, the parties focused much

Mot. to Dismiss

2

attention on the conduct of the post-plea counsel. Now, six years later, Kroytor's story has changed. ECF 78-1, 78-2. Now the claim is that Graysen *did* talk to him about the immigration consequences (because Kroytor asked about them) but told him that he had "bigger problems"—such as staying out of prison. We will never know which version of Kroytor's story is true and which version is as false as the bills that he submitted to Medi-Cal. Graysen is not available to confirm or deny the contents of any discussions that he might have had with Kroytor and his wife because Graysen died in 2010. ECF 37 at 10. When the undersigned attorney awkwardly[1] tracked down Graysen's widow in 2016, she confirmed that Graysen's legal files were no longer in existence. ECF 41-3; 41-2.

Also deceased is "lion" of the Sacramento defense bar Quin Denvir,[2] who appears on the docket as having been present with Kroytor on the day of his change of plea, presumably before his change-of-plea counsel arrived. ECF 8. Despite the fact that Mr. Denvir was a law partner of Kroytor's first *coram nobis* attorney, Mr. Blackmon, and was alive when Blackmon was drafting the first petition, it is unclear (and will never be known) what Denvir's involvement was on the day of the change of plea. And, in a pattern that is becoming macabre, Blackmon is now deceased as well, without having provided a declaration about his involvement in the first *coram nobis* petition and without being available for the government to contact or cross-examine.[3]

## II.   ARGUMENT

### A.   The *coram nobis* petition is barred by Kroytor's collateral attack waiver.

The right to collaterally attack a conviction may be waived in a plea agreement. *United States v. Lo*, 839 F.3d 777, 783 (9th Cir. 2016); *United States v. Abarca*, 985 F.2d 1012, 1014 (9th Cir. 1993). Such a waiver is enforceable if (1) the waiver's language encompasses the grounds raised on review, and (2) the waiver was knowing and voluntary. *Lo*, 839 F.3d at 783.

---

[1] Graysen's death occurred just seven days after he was sentenced in federal court, having been prosecuted by the Department of Justice, for money laundering and perjury. Case No. 2:09-cr-00400-RGK, C.D. Cal. (July 29, 2010). *See, also*, *United States v. Urutyan*, 564 F.3d 679 (4th Cir. 2009) (describing the events in the Eastern District of Virginia that had led the Department of Justice to conclude that Graysen was a "subject" of a criminal investigation in that district, and affirming the district court's decision to disqualify him in the underlying criminal case because of those facts).

[2] https://www.sacbee.com/news/local/article81833267.html

[3] https://www.sacbee.com/news/local/obituaries/article256385137.html

MOT. TO DISMISS            3

1. **The waiver encompasses Kroytor's petition.**

The plea agreement that Kroytor signed in September of 2003 provides as follows: "The defendant specifically agrees to waive his right to appeal his conviction and the sentence imposed by the court, and further agrees to waive his right to make any collateral attack on any aspect of the proceedings, including sentencing." ECF 37-7 at 3. The Ninth Circuit has held, consistent with numerous other courts of appeals, that *coram nobis* petitions are a collateral attack. *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994). This language plainly forecloses the collateral attack styled as a petition for a writ of error *coram nobis* that is now pending before this Court.

2. **The waiver is knowing and voluntary**

Because his conviction became final before the Supreme Court decided *Padilla v. Kentucky*, 559 U.S. 356 (2010), a passive "failure to advise" about immigration consequences, even if true, would not constitute ineffective pre-plea assistance rendering the waiver unenforceable. *Chaidez v. United States*, 568 U.S. 342, 344 (2013) (*Padilla* "does not have retroactive effect," and therefore a "person whose conviction became final before we decided *Padilla*" cannot benefit from it). Kroytor acknowledged this in his first petition. ECF 37 at 19. So he is required to change his story. Now, despite claiming before that he never discussed immigration consequences with Graysen, Kroytor alleges that Graysen gave him affirmative misadvice by telling him that he had bigger things to worry about. He fails to meet his burden to show either deficient performance or prejudice.

The High Court established its well-known standard for ineffective assistance in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate that counsel was constitutionally ineffective, a defendant must show that counsel's representation "fell below an objective standard of reasonableness" and that he was "prejudiced" as a result. *Id.* at 692. Kroytor fails to satisfy either prong of *Strickland*.

There is no evidence that Graysen's performance was deficient. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* The court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

1  evaluate the conduct from counsel's perspective at the time." *Id*. "Because of the difficulties inherent in
2  making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the
3  wide range of reasonable professional assistance; that is, the defendant must overcome the presumption
4  that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*.

5        The only alleged pre-plea advice that Kroytor points to is that Graysen told him that he had
6  bigger things to worry about than his immigration consequences.  Even if the Court were to credit
7  Kroytor's newest version of what Graysen told him, Graysen's advice was "within the wide range of
8  reasonable professional assistance." *Strickland*, 466 U.S. at 689.  For some defendants, avoiding
9  immigration consequences is the only thing that matters.  For others, however, avoiding lengthy prison
10 sentences is the most important goal.  A professional assessment that the potential for years in prison
11 (followed by deportation anyway) is a "bigger problem" to worry about than being banished to Canada
12 was well within the range of what a competent lawyer might have told Kroytor.  And it is not just the
13 government who says so:  Kroytor himself swears under penalty of perjury that "[Graysen] knew my
14 <u>primary objective</u> was to remain out of custody so that I could continue to work and help support my
15 family." ECF 78-2 ¶ 6 (emphasis added).  His wife agrees.  ECF 78-3 ¶ 6 ("[Graysen] knew it was
16 important to Yuly to stay out of custody so that he could continue working to support his family.").

17       In the years that have passed between Kroytor's first *coram nobis* petition and this one, the
18 Supreme Court has instructed courts on how they should approach cases where a criminal defendant
19 wants to collaterally attack a guilty plea on the basis of (allegedly) bad immigration advice.  It dooms
20 Kroytor's argument.  "Surmounting *Strickland*'s high bar is never an easy task, and the strong societal
21 interest in finality has special force with respect to convictions based on guilty pleas." *Lee v. United*
22 *States*, 137 S. Ct. 1958, 1967 (2017).  "Courts should not upset a plea solely because of *post hoc*
23 assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.
24 Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed
25 preferences." *Id*.  The defendant must prove a "reasonable probability that, but for counsel's errors, he
26 would not have pleaded guilty and would have insisted on going to trial." *Id*. at 1965.

27       The Supreme Court used "the unusual circumstances" of *Lee* to show the type of
28 "contemporaneous evidence" that must be brought forth to meet *Strickland*'s "high bar."  In *Lee* there

MOT. TO DISMISS                       5

was "no question that deportation was the determinative issue in Lee's decision whether to accept the plea deal." *Id*. at 1967. That is 180 degrees different from Kroytor, who swears that he had told his lawyer the exact opposite, that his "primary objective was to remain out of custody." ECF 78-2 ¶ 6; 78-3 ¶ 6. Unlike Kroytor, "Lee asked his attorney repeatedly whether there was any risk of deportation from the proceedings." *Id*. But Kroytor either never brought up the topic of immigration (if you believe his 2016 declaration) or he brought it up only once and never mentioned it again (if you believe his 2021 declaration.) He committed perjury in one of those declarations, but regardless, he is not like the defendant in *Lee*. Unlike Kroytor, "both Lee and his attorney testified at the evidentiary hearing below that Lee would have gone to trial if he had known about the deportation consequences." *Id*. at 1967–68. In *Lee* (just as in this case), the judge warned Lee that conviction "could result in your being deported." *Id*. at 1968. But unlike Kroytor, Lee told the judge—after receiving the Rule 11 warning about immigration consequences—that this changed whether he wanted to go forward. *Id*. Unlike Lee, who had "never returned [to South Korea] since he was a child," Kroytor routinely travels to Canada: in fact, he received his notice to appear when he was returning from one such trip back home to visit his parents in 2007. ECF 37-1 at 6.

     In every way, Kroytor's case differs from the ways that the Supreme Court found *Lee* to overcome the "high bar" of invalidating a plea. He did not "ask [Graysen] repeatedly" about avoiding immigration consequences. He explicitly told his lawyer that staying out of prison was his "primary concern." He did not balk when Judge Damrell warned him about the immigration consequences. And—given his history—that makes sense. A man who had never had a scrape with the law was facing either: (a) the potential of years in a federal prison or; (b) moving back to Canada where his parents still lived. While there might be some people who would choose the lengthy prison term over Canada, it is Kroytor's burden to provide "contemporaneous evidence" that he would have rejected the plea. Instead, all that he has given this Court is the type of "*post hoc* assertion" that the Supreme Court has said cannot be used to overcome the "strong societal interest in finality [that] has special force with respect to convictions based on guilty pleas." *Lee,* 137 S. Ct. at 1967.

     If Kroytor fails to establish either *Strickland* prong, the Court must enforce the waiver. He has failed to prove both prongs. Graysen's advice—to the extent that we can reconstruct it 19 years after the

fact with conflicting declarations by Kroytor—was within the "range of professionally competent counsel." Pre-*Padilla*, Graysen was under no obligation to affirmatively warn Kroytor about immigration consequences, and Kroytor's own declaration says that avoiding prison time was known by Graysen to be Kroytor's "primary concern." And Kroytor has not shown, with contemporaneous evidence beyond his *post hoc* assertions, that his expressed preference would have risked going to prison for years if that was what it took to avoid a risk of going home to Canada. Because Graysen's pre-plea advice was effective, Kroytor's collateral attack waiver is valid and the Court should enforce it.

### B. The *coram nobis* petition should be dismissed on the basis of laches.

There is a limitations period inherent in *coram nobis* petitions; one reason why this Court denied the prior motion was that Kroytor had failed to prove "valid reasons for delay." But before the Court wades into the merits of the motion, *coram nobis* petitions are also subject to the equitable limitations based on the doctrine of laches. *Telink*, 24 F.3d at 45. Unlike a limitations period, which bars an action strictly by time lapse, laches bars a claim if unreasonable delay causes prejudice to the respondent. *Id*. A defense based on laches "does not supplant or restate the second *Hirabayashi* requirement, but rather constitutes a supplemental defense that the government may invoke when a petitioner seeks *coram nobis* relief." *United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007). A district court is free at any time to apply laches to a *coram nobis* petition, if the petitioner inexcusably delays in asserting his claims and the government is prejudiced by the delay. *Telink,* 24 F.3d at 47.

In order for laches to bar the claim, the government first must make a prima facie showing of prejudice as a result of the defendant's delay. *Id*. *at* 47-48. If the government meets that burden, the burden of production of evidence then shifts to the defendant to show either that the government actually was not prejudiced or that the petitioner exercised reasonable diligence in filing the claim. *Id*. In making a determination of prejudice, the effect of the delay on both the government's ability to respond to the petition and the government's ability to mount a retrial are relevant. *Id*.

      a.     The government is prejudiced in its ability to defend the petition.

Graysen died in 2010. Kroytor was already in immigration proceedings in 2007. During the time after the defendant <u>knew</u> he was subject to immigration consequences, his pre-plea lawyer died. This is relevant to the government's defense of the petition. Now that Kroytor has changed his

argument to make allegations that Graysen provided affirmative misadvice, Graysen's recollections of what he did and why he did it have become relevant.  His records have become relevant.  But Graysen will never testify one way or the other, because he died three years after the defendant was given his first notice to appear.  Even after Graysen's death, the government might have been able to respond to the petition if the defendant had been diligent in pursuing this motion.  It appears that Graysen's files might have been in existence until at least 2011.  But with the passage of time, the only person in the world who appears to have had access to this files states that they would not have been retained any longer than that date.  The government will never know whether Graysen's files provide information relevant to the petition, because the defendant sat on this claim instead of diligently pursuing it.

Beyond Graysen, the government is prejudiced by the inability to interview Denvir.  The docket entry shows that this "legal giant" represented the defendant at some point on the day of his change of plea.  Even if it ends up being true that Graysen told the defendant to simply "answer every question yes," there is a significant question as to what advice, if any, the defendant received from Denvir.  Presumably Denvir, the federal defender, did not simply tell the defendant to "say yes" to every question.  We will never know what advice—if any—the defendant received from the federal defender that day.  But we would have known the answer to that question if the defendant had not delayed eight years in filing this motion.

Beyond Graysen and Denvir, there is now a third attorney who has died while Kroytor's claim was growing increasingly stale.  As this Court previously found, and affirmed by the Ninth Circuit, Kroytor's delay in filing the first coram nobis petition, while represented by Blackmon, was unreasonable.  *United States v. Kroytor*, 977 F.3d 957, 958 (9th Cir. 2020).  We will never know the intricacies of Blackmon's reasoning, research, or thoughts because Kroytor (while represented by three new attorneys:  Littrell, Chen, and now Ms. Radekin) allowed the case to go stale.  Blackmon is now unavailable to shed light on the subject of his involvement and whether he was ineffective.  The government is prejudiced by the death of three attorneys whose conduct has been challenged by Kroytor.

          b.      The government is prejudiced in its ability to try the case.

In this case, FBI records show that evidence consisting of bank records that were obtained by subpoena were destroyed one year after the defendant's conviction became final.  ECF 41-5.  Although

some evidence remains in the FBI case file, some of it is now gone.  As previously noted, indications from inquiries made to the bank in question have revealed a substantial likelihood that the bank records will never be recovered, because the records are now far older than the mandatory document retention age.  ECF 41-2.  If the defendant had acted in a timely manner, there was at least a chance that some of the documents from that bank could have been re-subpoenaed as evidence for trial.  Now, that appears unlikely, entirely due to the defendant's lack of diligence.

Even if actual documents had not fallen behind the reach of the government, a nineteen-year delay in trial would prejudice the government in other ways.  This investigation began when numerous patients and doctors were interviewed by fraud investigators.  Even assuming that those witnesses are not deceased (and the process of attempting to locate them has been fruitless so far), witnesses' memories will necessarily have faded with the passage of decades of time.

Even excusing the defendant's delay from 2003 to 2007 (despite the fact that Judge Damrell told him that he would face immigration consequences), the defendant's inexcusable delay from the time that he "knew" his conviction was a problem has caused the spoliation of evidence, the death of witnesses, and likely failure of witnesses' memories.  All of these consequences could have been avoided if the defendant had simply diligently pursued this petition once he knew that his conviction was going to cause trouble.

### III.   CONCLUSION

The government asks the Court to dismiss the petition as filed in violation of Kroytor's knowing and voluntary waiver of his right to collaterally attack his conviction.  Alternatively, the government asks the Court to dismiss the petition on the equitable defense of laches.

Dated:  March 7, 2022

PHILLIP A. TALBERT
United States Attorney

By: /s/ MATTHEW G. MORRIS
MATTHEW G. MORRIS
Assistant United States Attorney